IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID C. RIVERS,

        Plaintiff,                      No. CIV S-04-2524 GEB EFB P

   vs.

E. ROSZKO, et al.,

        Defendants.             FINDINGS AND RECOMMENDATIONS

                              /

       Plaintiff is a prisoner without counsel suing for alleged civil rights violations. *See* 42 U.S.C. § 1983. Currently pending before the court is defendants' motion for summary judgment.

       This action proceeds on the November 29, 2004, complaint in which plaintiff claims the following: (1) defendants E. Roszko and Sgt. Lees were deliberately indifferent to plaintiff's serious medical needs by permitting his transfer from to Avenal State Prison ("ASP") even though a physician recommended that he not be transferred until after a physical examination based on plaintiff's complaints of chest pain, Complaint ("Compl."), at 5; and, (2) following the transfer, defendants H. Smith, Douglass, Cain and D. Smith "refused to continue plaintiff's treatment which had been alleviating plaintiff's symptoms," resulting in a deterioration of plaintiff's health." Compl., at 6. For the reasons explained below, the court finds that there is no genuine issue for trial.

1

## I.  Facts

At all times relevant to this action, plaintiff was a prisoner confined at the California Medical Facility ("CMF") and ASP. Defendant Roszko worked at CMF, and was a member of a Unit Classification Committee[1] that recommended plaintiff be transferred to a different prison. Defs.' Stmt. of Undisp. Facts ("SUF"), 3. Defendant Lees was a sergeant at CMF. Compl., at 5. Defendants Doctors Cain, Douglass, D. Smith and H. Smith were physicians at ASP.

Plaintiff suffers from a number of medical problems. Thus, on May 15, 2002, a physician found that he was "permanently mobility impaired" in the lower extremities and designated him "disability placement mobility" ("DPM") designation, meaning that he could not walk "100 yards or up a flight of stairs without pausing with the use of aids (crutches, prosthesis, or walker." SUF 1. The record is not clear about where plaintiff was confined at this time.

The record is clear, however, that on July 19, 2002, plaintiff was confined at CMF. SUF 2. Plaintiff has submitted evidence that he complained of dental problems[2] on December 18, 2002. Pl.'s Opp'n, Ex. A, unnumbered page 15. A dentist determined that plaintiff had decay and abscesses, prescribed Penicillin and Motrin, and recommended extractions after plaintiff was cleared for it by a cardiologist. Pl.'s Opp'n, Ex. A, unnumbered page 15. Again on February 18, 2003, a physician found that because of poor dentation, plaintiff should have a full liquid diet for six months. Pl.'s Opp'n, Ex. A, unnumbered page 11. A dietician wrote a note on the bottom requesting that the physician refer plaintiff for dental work because dietary modifications were only a temporary solution for a dental problem. *Id*. The dietician recommended the diet be continued for one month until plaintiff could see a dentist. *Id*. The six month recommendation was crossed out, and a duration of one month was written in. *Id.* On April 4, 2003, a dentist

---

[1] Neither party explains the function of such a committee.

[2] The record shows that plaintiff's history of dental problems dates back to at least 2001. Plaintiff submits evidence that on August 9, 2001, Dr. Calvin Steever, who is not a defendant in this action, found that plaintiff suffered from "poor dentation," and prescribed a full liquid diet for a duration of six months. Pl.'s Opp'n, Ex. A, unnumbered page 9.

2

noted that plaintiff still was waiting for a cardiologist to examine plaintiff and determine whether plaintiff was strong enough. Pl.'s Opp'n, Ex. A, unnumbered page 15. The dentist ordered a full liquid diet. *Id*.

On May 21, 2003, a classification committee hearing was held at CMF. SUF 3. Defendant Roszko was a member of this committee. SUF 3. Defendants have submitted a written record of the hearing showing that plaintiff attended. SUF 3. At deposition, however, plaintiff testified that he did not attend. Pl.'s Dep., at 38:5-8. Plaintiff's evidence shows that he was given written notice of the hearing. Pl.'s Opp'n, Ex. H, unnumbered page 12. At this hearing, the committee confirmed plaintiff's DPM designation and told him that pursuant to a March 4, 2003, memorandum addressing the disability placement changes, CMF no longer would house Level II prisoners with mobility impairments. SUF 3. The committee explained that because of his DPM designation, CMF could not accommodate him as required under federal and state law. SUF 3. Thus, plaintiff would be transferred either to ASP or to the Substance Abuse Treatment Facility at California State Prison, Corcoran in order to ensure his placement in a prison with housing and programs which were accessible to him. *Id*. The committee referred the transfer to a Classification Staff Representative for review and approval. *Id*. At deposition, plaintiff testified that in May of 2003, after the classification hearing, Roszko gave plaintiff a paper notifying him that his classification points had decreased.[3] Pl.'s Dep., at 24:3-4.

Plaintiff has submitted a May 28, 2003, document showing that Dr. Steever and the Chief Medical Officer at CMF noted that plaintiff:

> previously had extensive fractures of his lower extremities, back and pelfis. He has been left with disabilities, though he is ambulatory. Also, in December 2000, he had severe head injuries and he is left with neurologic sequelae, has near syncopal spells, has unsteady gait, and has some cognitive loss. He was also left with chronic back and neck pain.

---

[3] Neither party explains the significance of this decrease.

> He should continue to be housed in a lower bunk. He may obtain a bed board, cane, and elastic pull-on ankle brace for the right ankle, a Velcro closure lumbo-sacral back brace, and a cervical pillow.
>
> In the event of demand for lower bunks exceeding the supply at this institution, the above-mentioned disabilities should be taken into account should transfer to another prison be contemplated.

Pl.'s Opp'n, Ex. H, unnumbered page 2. Amongst plaintiff's medical needs were a bed board, a cane, dental care, physical therapy and a liquid diet. Pl.'s Dep., at 38:24-25 through 39:1-4. He was on medication for a heart condition and suffered dizziness as a result of other prisoners having attacked him. *Id.*, at 38:24-25 through 39:1-4. Plaintiff testified that Roszko knew of his medical conditions because he saw some of his medical records on her desk and because Roszko commented that he had a number of medical problems. *Id.*, at 39:10-14.

On June 16, 2003, G. Munoz, a Classification Staff Representative, approved plaintiff's transfer to ASP. SUF 4. At deposition, plaintiff testified that in June of 2003, Rozsko gave plaintiff a paper notifying him of the transfer. Pl.'s Dep., at 24: 4-7. Rozsko told plaintiff that the transfer was not her decision. *Id.*, at 28:14-18.

On June 27, 2003, plaintiff saw a cardiologist at CMF. Pl.'s Opp'n, Ex. E, unnumbered page 1. The cardiologist noted that plaintiff had a history of heart attack, stroke, chronic back pain, coronary stents, head trauma and plorygium in his left eye. *Id.* He examined plaintiff and recommended that plaintiff undergo an EKG, ETT, CRR, echocardiogram, neurological evaluation and follow up with cardiology in four weeks. *Id.* The cardiologist noted that plaintiff was "cleared for dental work." *Id.*

On July 8, 2003, a physician and the Chief Medical Officer at CMF signed a document directing that plaintiff's transfer be delayed "pending current evaluation by the cardiologist for the patient's chest pain, which is occurring daily. . . . He should be held from possible transfer through at least October 15, 2003." Pl.'s Opp'n, Ex. E, unnumbered page 3. A notation on the document suggests that copies of it were placed in plaintiff's medical and central files. *Id.* On the bottom of this document is the handwritten notation:

4

> This chrono[4] was sent to me last week from CMF, it is dated 7-8-03 thru 10-15-03, therefore this chrono is good and in conformance with Plata v. Davis. C-01-1351 T.E.H. medical chronos remain in effect after transfer. I was tranferred illegally and CMF provided me with this chrono which I should have had prior to being moved and sent it via U.S. mail system to me at Avenal State Prison.

*Id.* At deposition, plaintiff testified that he showed Rozsko a document stating that he must not be transferred because of his medical condition. Pl.'s Dep., at 26:9-11, 18-21, and 27:1-6. In early July 2003, plaintiff met with defendant Lees, and Lees told plaintiff that he would be transferred to ASP. SUF 12-13. Plaintiff also testified at deposition that about one day before the transfer, plaintiff returned to Rozsko with an order not to transfer him because of his medical conditions and stating that he must undergo a thorough examination before a transfer. Pl.'s Dep., at 29:3-4, 30:11-15, 20-23. According to plaintiff Rozsko, however, refused to look at the paperwork. *Id.*, at 30:7-8 and 32:11-15. Plaintiff conceded at deposition that he was not sure whether the papers he showed her the second time were the same as those he showed her the first time. *Id.*, at 30:16-19.

On June 25, 2003, plaintiff filed a grievance alleging that his daughter had purchased a subscription to a magazine for plaintiff, but he had received only one issue. Pl.'s Opp'n, Ex. F, unnumbered page 5; SUF 5. He believed that defendant Lees and other officers were interfering with the delivery of his mail, but that Lees primarily was responsible. Pl.'s Opp'n, Ex. F, unnumbered page 5, 10; Pl.'s Dep., at 41:13-18. A day or two before the transfer, defendant Lees called plaintiff to his office, told plaintiff he was being transferred, and "chewed [him] out and swore at [him]." Pl.'s Dep., at 41, 42:12-13. This was the only time plaintiff ever spoke with defendant Lees. *Id.*, at 41:2, 5-10. No one was present other than plaintiff and Lees. *Id.*, at 42:20-22.

////

---

[4] Although both parties use it, neither party defines the term "chrono." A "chrono" appears to be a written record relating to a prisoner's health or other matter, which is placed in the prisoner's file.

5

On July 2, 2003, an appeals coordinator responded that she had contacted the publisher, and the magazine had been sent to the wrong address. *Id.* She also stated that the publisher had the correct address and would extend the expiration date by three months in order to make up for plaintiff's loss. *Id.* At deposition, plaintiff conceded that Roszko could not have recommended plaintiff's transfer in retaliation for filing grievances about the magazines. SUF 7. He also conceded that he has no evidence to support his allegation that defendant Lees knew about the grievance he filed about the missing magazines. SUF 8. Lees never stated that he intended to retaliate against plaintiff. SUF 10. Plaintiff did not obtain information from any source that would suggest Lees had a retaliatory motive. SUF 11. Plaintiff concedes that he does not know whether Lees ordered that he be transferred to ASP. SUF 14.

In July 2003, plaintiff complained of chest pain. SUF 17. He underwent a chest x-ray, the results of which showed "no acute cardiopulmonary disease." *Id.* Six days later, he underwent an echocardiogram. SUF 18. On July 8, 2003, plaintiff was examined by Dr. Shellcroft, who is not a defendant. Dr. Shellcroft prescribed a 90-day course of Vioxx. SUF 19; Pl.'s Opp'n, Ex. E, unnumbered page 11. Dr Shellcroft also wrote, "fill out new 1845 change to DNM from DPM." *Id.* On July 10, 2003, plaintiff saw a neurologist. SUF 20. The next day, July 11, 2003, plaintiff was transferred from CMF to ASP. SUF 2, 6

On August 26, 2003, a physician[5] at ASP noted that plaintiff was waiting to be seen by a cardiologist, suffered back pain for which he had a "TENS unit,"[6] right hip pain, old head injuries for which he needed x-rays and an MRI, and bad teeth for which he had been prescribed Motrin. Pl.'s Opp'n, Ex. A, unnumbered page 16. The physician recommended discontinuing the Motrin because the "risk benefit ratio does not justify use at this time." *Id.* His medications
////

---

[5] The signature is illegible.

[6] Neither party explains what this is or what it does.

6

at the time were Isososbide SA, Zantac, NTG, Lipitor, Meclizine, Plavix and Metamucil.[7] *Id.* Finally, the doctor noted that he would "defer MRI head at this time since neuro exam does not show significant assymmetry and pt seems to be doing okay; will check [sic] for f.B. [sic] on [sic] skull films." *Id.*   Also on this date, defendants S. Douglass and R. Davis determined that plaintiff was completely "permanently medically disabled due to his medical disability" and referred him "to classification committee."  Pl.'s Opp'n, Ex. B, unnumbered page 7.
On September 25, 2003, defendant Dr. Cain approved Dr. Douglass' request that plaintiff be referred to a cardiologist for a coronary angiogram.  Pl.'s Opp'n, Ex. L, unnumbered page 10. Also at deposition, plaintiff conceded that he does not remember ever having been examined by defendant Dr. Cain or visiting him for any reason.  SUF 16.  He does not know of any particular act Cain took that violated his rights.  SUF 15.

On July 17, 2003, defendant Dr. D. Smith prescribed a "TENS" unit, case, electrodes, batteries and battery charger for plaintiff.  SUF 21.  He ordered that these items would be deemed plaintiff's personal property and would accompany him in the event of any transfer. SUF 21.  On July 23, 2003, defendant Dr. Douglass authorized plaintiff to have a cane for at least one year.  SUF, Ex.. N.  Also on that date, Dr. Douglass authorized plaintiff to have a lower bunk on a lower tier for the entire time he was confined at ASP.  SUF, Ex. O.

On August 12, 2003, a physician at ASP who is not a defendant in this action signed a document stating that plaintiff's bed could not be under a ventilator.  SUF 25.  On August 26, 2003, Dr. Douglass signed a document officially designating plaintiff as "totally medically disabled due to his medical disability," and referring him to a classification committee.  SUF 26. Also in August 2003, it was recommended that plaintiff undergo an X-ray of his skull.  SUF 27. On September 4, 2003, at plaintiff's request, defendant Douglass prescribed a bench walker. SUF 28.  On September 4, 2003, Dr. Pappenfus referred plaintiff to a cardiologist, Dr. W.

---

[7] Neither party explains what any of these medications are for.

Bezdek at Bakersfield Cardiopulmonary Medical Group.  SUF 29, 31.  Also on September 4, 2003, a physician at ASP recommended authorizing plaintiff to be permitted to use a walker for one year.  Pl.'s Opp'n, Ex. H, unnumbered page 9.

On September 8, 2003, plaintiff underwent a radiological study of his skull.  SUF 30.  On September 17, 2003, plaintiff had a cardiopulmonary consultation with Dr. W. Bezdek of the Bakersfield Cardiopulmonary Medical Group.  SUF 31.  The referral to Dr. Bezdek resulted from a finding that plaintiff suffered from "chest pain syndrome."  SUF 31.  Dr. Bezdek recommended that plaintiff undergo a coronary angiography to define the anatomy and function of plaintiff's heart.  SUF 31.  Dr. Bezdek stated that he would schedule the angiogram at San Joaquin Community Hospital.  SUF 31.  On September 25, 2003, defendant Dr. Cain approved Dr. Douglass' request that plaintiff be referred to a cardologist for a coronary angiogram.  Pl.'s Opp'n, Ex. L, unnumbered page 10.  Also at deposition, plaintiff conceded that he does not remember ever having been examined by defendant Dr. Cain or visiting him for any reason.  SUF 16.  He does not know of any particular act Cain took that violated his rights.  SUF 15.

On October 3, 2003, defendant D. Smith authorized plaintiff to have and use dark sunglasses for the duration of his confinement at ASP.  SUF 32.  On the same date, prison medical staff[8] recommended "surgical removal of pterygium."[9]  SUF, Ex. Y.  On October 29, 2003, plaintiff filed a request for accommodation based on his disabilities.  Pl.'s Opp'n, Ex. H, unnumbered page 18.  He complained that the air conditioning vents were directed at his bunk bed and he suffered constant congestion, headaches and sore throat and pain in his bones from previous injuries.  *Id.*  He requested that he be relocated to a warmer institution, such as CMC-E or CMF.  *Id.*  On December 29, 2003, defendant Douglass referred plaintiff to a facility outside the prison for "pterygium removal."  SUF 34.  Plaintiff underwent the surgery in January 2004.

---

[8] The signature on the written recommendation is illegible.

[9] Neither party defines "pterygium."

SUF 35.

A physician examined plaintiff in January 2004, and decided not to renew the Vioxx prescription. SUF 19. On February 13, 2004, defendant Douglass referred plaintiff to the San Joaquin Community Hospital for a coronary angiogram. SUF, 36 & Ex. CC. He underwent the procedure on February 18, 2003, following which a physician who is not a defendant, Dr. Paw, recommended that plaintiff undergo coronary bypass surgery the following day. SUF 37, 38. Dr. Paw explained the risks, benefits and alternatives, and plaintiff declined to undergo the procedure. SUF 38. At deposition, plaintiff testified that he did not want to undergo quadruple bypass surgery while he was in prison. Pl.'s Dep., at 60:10-12.

A physician examined plaintiff in March 2004. SUF 19. Again, the physician decided not to renew the Vioxx prescription. SUF 19. On April 21, 2004, Dr. Burns referred plaintiff for dental work involving the extraction of several teeth. SUF 39. On May 13, 2004, Dr. D. Smith referred plaintiff for a neurological examination for "s/p head injury with residual memory and ambulation deficits." SUF 40. Thus, on June 8, 2004, plaintiff underwent an MRI of his head. SUF 41, 42.

In late February or early March of 2004, plaintiff requested a liquid diet with an ice chest and a CT scan. This request was denied on medical review because a physician did not make the requests. SUF 44. In November 2004, Dr. Burns referred plaintiff for additional dental work, including extractions. SUF 43. Plaintiff has submitted photographs and dental records showing that a number of his teeth were extracted. Pl.'s Ex. A, at 5. The dates on the records have been crossed out. *Id.* The court therefore cannot determine when these extractions occurred.

At deposition, plaintiff testified that Dr. H. Smith looked at his medical records and tried to prescribe proper medications and procedures. Pl.'s Dep., at 58:5-8. Plaintiff testified that he did not believe that defendant H. Smith provided all the medications and procedures he was getting at CMF, such as heart medication, a liquid diet, Vioxx, treatment for hemorrhaging in his eye. *Id.*, at 59:9-25 - 60:1-12. Significantly, however, he conceded that not every medication

1 and treatment he thought he needed was available at ASP, and that defendant H. Smith appeared
2 to be doing the best that he could for plaintiff. *Id*., at 60:8-10.

3 **II.     Standards on Summary Judgment**

4 Summary judgment is appropriate when it is demonstrated that there exists "no genuine
5 issue as to any material fact and that the moving party is entitled to a judgment as a matter of
6 law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district
> court of the basis for its motion, and identifying those portions of
> "the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any," which it
> believes demonstrate the absence of a genuine issue of material
> fact.

11 Summary judgment avoids unnecessary trials in cases with no genuinely disputed
12 material facts. *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468,
13 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to
14 require submission to a jury or whether it is so one-sided that one party must prevail as a matter
15 of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to
16 screen the latter cases from those which actually require resolution of genuine disputes over
17 material facts; e.g., issues that can only be determined through presentation of testimony at trial
18 such as the credibility of conflicting testimony over facts that make a difference in the outcome.
19 *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

20 Focus on where the burden of proof lies as to the issue in question is crucial to summary
21 judgment procedures. "[W]here the nonmoving party will bear the burden of proof at trial on a
22 dispositive issue, a summary judgment motion may properly be made in reliance solely on the
23 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed,
24 summary judgment should be entered, after adequate time for discovery and upon motion,
25 against a party who fails to make a showing sufficient to establish the existence of an element
26 essential to that party's case, and on which that party will bear the burden of proof at trial. *See*

*id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In this regard, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In attempting to establish the existence of a factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). However, the opposing party must demonstrate with adequate evidence a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989). The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252. If the evidence presented

could not support a judgment in the opposing party's favor, there is no genuine issue. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

On January 18, 2007, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

On June 16, 2006, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

**III.   Analysis**

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

at 248. Here, plaintiff's action arises under 42 U.S.C. § 1983 and the First and Eighth Amendments. To prevail at trial, he must prove that the defendants violated his constitutional rights while acting under state law. On his retaliation claim, plaintiff must prove by a preponderance of the evidence that the defendants took adverse action against him for his engagement in a constitutionally protected activity, the adverse action chilled the exercise of his rights, and the action did not reasonably advance a legitimate penological goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *Rizzo v. Dawson*, 778 F.2d 527, 531-32 (9th Cir. 1985). To prove an Eighth Amendment violation, plaintiff must show by a preponderance of competent evidence that the defendant knew plaintiff faced a risk of harm that "is not one that today's society chooses to tolerate," and that the defendant was "deliberately indifferent" to that risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). As discussed below, plaintiff has failed to establish a genuine dispute for trial over these material issues.

**A. Retaliation**

As noted, plaintiff claims that defendants Roszko and Lees transferred him in retaliation for his having filed grievances against them. Defendant Roszko asserts that plaintiff cannot adduce any evidence of a connection between his grievances about his magazines and the decision to transfer him to ASP. A retaliation claim has five elements: (1) a state actor took some adverse action against a prisoner; (2) because (3) the prisoner engaged in protected conduct; (4) resulting in the chilling of plaintiff's First Amendment rights; and (5) the action did not reasonably advance a legitimate penological goal. *Rhodes*, 408 F.3d at 567-68. Institutional order and discipline are legitimate penological goals. *Rizzo*, 778 F.2d at 532. To survive summary judgment, plaintiff must adduce evidence that prison officials took some action against him "for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals." *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam). Plaintiff has the burden of establishing a causal connection between the exercise of constitutional rights and the allegedly retaliatory action. *See Pratt v. Rowland*, 65 F.3d 802, 807

13

(9th Cir.1995).

### B. Defendant Roszko

Plaintiff fails to submit any evidence of a causal connection between Roszko's actions and the grievance. It is undisputed that defendant Roszko was a member of the classification committee that determined plaintiff should be transferred. Furthermore, plaintiff testified at deposition that in June of 2003, Roszko gave plaintiff a paper notifying him of the transfer. However, plaintiff admitted at deposition that Roszko told him that she herself had not made the decision to transfer him. Plaintiff offers no direct evidence that she made the decision. The fact of her position on the committee is not sufficient because there is no evidence suggesting that in that capacity she had the authority to make decisions about housing. Moreover, defendants have submitted a document showing that on June 16, 2003, a different prison official who is not a defendant in this action approved the transfer to ASP. Thus, there is no genuine issue about whether Roszko actually caused the transfer.

Furthermore, the timing of the decision to transfer plaintiff and plaintiff's exercise of his First Amendment rights belies any retaliatory motive. As noted, the decision to transfer plaintiff was made on June 16, 2003. Plaintiff filed the grievance about not receiving his magazines on June 25, 2003. He was transferred on July 11, 2003. Plaintiff filed the grievance after prison officials decided to transfer him. In a retaliation claim, timing is relevant to the question of motive. Inherent in retaliation is the defendant's intent to take adverse action against the plaintiff based on something that the plaintiff already has done. Here, then, even if plaintiff had evidence that Roszko made the transfer decision, it is undisputed that the decision, and thus the reasoning behind it, was made before plaintiff complained about his magazines. While plaintiff has submitted evidence that he tried to persuade Roszko to stop the transfer, the evidence is not clear on exactly when this happened or that Rosko's refusal was based upon anything except that transfer decisions were not hers to make. Plaintiff offers no evidence that she even knew about his magazine grievances. Finally, as noted above, there is no evidence that defendant Roszko

14

had the authority to stop the transfer. On this evidence, the court cannot find that there is a genuine dispute for trial. Accordingly, Roszko is entitled to judgment as a matter of law on this claim.

**C. Defendant Lees**

Plaintiff also claims that defendant Lees transferred him in retaliation for complaining about the loss of his magazines. It is undisputed that in the grievance, plaintiff assigned fault primarily to defendant Lees. At deposition, plaintiff testified that a day or two before the transfer, Lees called plaintiff to his office, told him again that he was being transferred and spoke harshly to him. A few days before the July 11 transfer likely would have been after he submitted the June 25 grievance. Since the grievance specifically identified Lees, the court finds it reasonable to infer that Lees knew about it. However, as noted, plaintiff testified at deposition that Lees "chewed him out and swore at him." He does not, however, state any of the particular things that Lees said. Furthermore, the undisputed evidence shows that a different prison official made the decision to transfer plaintiff, and that this decision was made before plaintiff complained about his magazines. There is no evidence that Lees had the authority or opportunity to change that decision. Thus, there is no genuine dispute about whether Lees made or influenced the decision to transfer plaintiff or had the authority to rescind that decision once made. Accordingly, whether he may have had a basis to form a retaliatory motive is immaterial. Defendant Lees is entitled to judgment as a matter of law on this claim.

**D. Deliberate Indifference to Plaintiff's Serious Medical Needs**

Plaintiff alleges that the remaining defendants, all medical staff employed at ASP, were deliberately indifferent to his serious medical needs. Prison officials violate the Eighth Amendment when they engage in "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A serious medical need is one that significantly affects an individual's daily activities, an injury or condition a reasonable doctor or patient would find worthy of comment or treatment, and chronic

15

and substantial pain. *See*, *e.g.*, *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.2d 1133, 1136 (9th Cir.1997) (*en banc*). A prison official is deliberately indifferent when he knows of and disregards a serious medical need. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The official must "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Deliberate indifference "may be manifested in two ways. It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). When prison medical personnel act based on "a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law." *Jackson v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996). Prison officials provide constitutionally inadequate care when they know that a particular course of treatment is ineffective, but they do not alter it in an attempt to improve treatment. *See Jett v. Penner*, 439 F.3d 1091, 1097-1098 (9th Cir. 2006). Here, it is undisputed that plaintiff had a number of serious medical needs, i.e., fractures in his lower extremities, back and pelvis, severe head injuries, and heart problems. Thus, the only question with respect to each remaining defendant is whether there is evidence to show they were deliberately indifferent to these serious conditions.

**1. Defendant Dr. Cain**

Dr. Cain asserts that plaintiff cannot adduce evidence that he was deliberately indifferent to any of plaintiff's serious medical needs. On September 25, 2003, defendant Dr. Cain approved Dr. Douglass' request that plaintiff be referred to a cardologist for a coronary angiogram. Pl.'s Opp'n, Ex. L, unnumbered page 10. At deposition, plaintiff conceded that he does not remember ever having been examined by defendant Dr. Cain or visiting him for any reason. SUF 16. Plaintiff does not know of any particular act Cain took that violated his rights.

SUF 15.  Thus, it appears that the limited contact defendant Cain had with plaintiff's medical conditions resulted in approving coronary care for plaintiff.  On the evidence before the court, there is no basis for finding a genuine issue about whether Cain was deliberately indifferent.  The motion on behalf of Dr. Cain must be granted.

### 2. Defendant Dr. Douglass

Dr. Douglass contends that the evidence demonstrates that his responses to plaintiff's medical needs were constitutionally adequate.  Dr. Douglass made the request for plaintiff to see a cardiologist, which Dr. Cain approved.  In July 2003, Dr. Douglass authorized plaintiff's use of a cane for one year.  He also authorized plaintiff to have a lower bunk on a lower tier for the entire time he was confined at ASP.  On August 26, 2003, Dr. Douglass signed a document officially designating plaintiff as completely medically disabled, which presumably made plaintiff eligible for various accommodations.  In September 2003, Dr. Douglass apparently realized that the cane did not satisfy plaintiff's needs, and authorized him to have a bench walker.  Plaintiff does not identify a single instance in which Dr. Douglass ignored his medical needs or prescribed a course of treatment he knew to be contraindicated.  On this evidence, the court finds that there is no genuine issue about whether Dr. Douglass was deliberately indifferent to plaintiff's serious medical needs.  The motion on behalf of defendant Douglass must be granted.

### 3. Defendant H. Smith

This defendant asserts that there is no genuine issue about whether he was deliberately indifferent to plaintiff's serious medical needs.  Defendant H. Smith appears to have had limited contact with plaintiff.  In fact, the records do not show that plaintiff had any contact with him.  However, at deposition, plaintiff testified that on the occasions when Dr. H. Smith was responsible for his care, he reviewed plaintiff's medical records and tried to prescribe proper medications and procedures.  Plaintiff conceded it was likely that the medications and procedures Dr. H. Smith did not provide were only those unavailable at ASP.  There is no

evidence that this defendant had any authority to transfer plaintiff to a different facility, or even to recommend such a transfer, but refused to do so. Accordingly, the court finds that there is no genuine dispute about whether defendant H. Smith was deliberately indifferent to plaintiff's serious medical needs. This defendant is entitled to judgment as a matter of law.

### 4. Defendant D. Smith

This defendant makes the same argument as the other doctors. It is undisputed that plaintiff had some difficulties with his eyes, although the nature of the problem is not clear. However, this defendant authorized plaintiff to have and to use dark glasses for the duration of his confinement at ASP. Because plaintiff's head injury continued to affect his memory and ambulation, this defendant referred plaintiff for a neurological examination, which resulted in an MRI of his head. There is no evidence that Dr. D. Smith ever ignored plaintiff's medical needs or prescribed contraindicated medications or procedures. Plaintiff has failed to demonstrate that there is a genuine dispute about whether this defendant was deliberately indifferent to his serious medical needs. Thus, the motion on behalf of Dr. D. Smith must be granted.

## IV.    Conclusion

On this motion for summary judgment, plaintiff had the burden of submitting evidence with respect to each claim showing that there is a genuine issue for trial. However, he fails in each instance. Therefore, defendants' motion for summary judgment must be granted.

Accordingly, it is hereby RECOMMENDED that defendants' February 11, 2008, motion for summary judgment be granted and that judgment be entered in favor of all defendants.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 15 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158

1  F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

2  Dated: August 26, 2008.

_____
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE